[No. 80395-1.   En Banc.]
Argued June 24, 2008.    Decided October 9, 2008.

THE CITY OF ARLINGTON ET AL., *Respondents*, v. THE CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, *Defendant*, FUTUREWISE, ET AL., *Petitioners*.

770

*Tim Trohimovich* (of *Futurewise*), for petitioners 1000 Friends of Washington, Futurewise, Pilchuck Audubon Society, and Agriculture For Tomorrow.

*Henry E. Lippek* (of *The Public Advocate*), for petitioner Stillaguamish Flood Control District.

*Robert M. McKenna, Attorney General*, and *Alan D. Copsey, Assistant*, for petitioner Department of Community, Trade, and Economic Development.

*Steven J. Peiffle*, for respondent City of Arlington.

*Todd C. Nichols* (of *Cogdill Nichols Rein Wartelle Andrews*), for respondent Dwayne Lane.

*Janice E. Ellis, Prosecuting Attorney*, and *John R. Moffat, Deputy*, for respondent Snohomish County.

*Robert M. McKenna, Attorney General*, and *Martha P. Lantz, Assistant*, for other party Central Puget Sound Growth Management Hearings Board.

*Timothy M. Harris* and *Andrew C. Cook* on behalf of Building Industry Association of Washington, amicus curiae.

*Jeffrey M. Eustis* on behalf of Western Washington Agricultural Association, amicus curiae.

¶1 SANDERS, J. — Snohomish County passed an ordinance amending the comprehensive plan to change the designation and zoning of 110.5 acres of land to urban and general commercial. The petitioners here requested the Central Puget Sound Growth Management Hearings Board (Board) review the county ordinance to determine if the decision was consistent with the requirements of the Growth Management Act (GMA), chapter 36.70A RCW. The Board found the ordinance invalid as noncompliant with the GMA. The Superior Court affirmed the decision of the Board. It also held the change was precluded on res judicata grounds because the County demonstrated no changed circumstances after a prior decision. The Court of Appeals unanimously reversed the Superior Court's decision and remanded the case to the Board. *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn. App. 1, 154 P.3d 936 (2007). The well reasoned and articulate

opinion by Judge Grosse is correct in all respects; we adopt the opinion, which follows, as our own.

The Growth Management Hearings Board must find compliance with the Growth Management Act (GMA), chapter 36.70A RCW, unless it determines that a county action is clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the GMA. Here, the Board failed to consider important evidence in the record that supports Snohomish County's finding that the land at Island Crossing was not land of long-term commercial significance to agriculture and thus eligible for redesignation to urban commercial use. Because, in light of the improperly dismissed evidence, the County's action redesignating the land was not clearly erroneous, we reverse and remand.

## FACTS

This appeal is the latest episode in a long fight over the designation of a triangular piece of land in Snohomish County located north of the City of Arlington. The land borders the interchange of Interstate 5 and State Road 530 and is part of an area known as Island Crossing.

*Prior Appeal*

The land at issue was designated and zoned agricultural in 1978. In 1995, Snohomish County adopted a comprehensive plan under the GMA. As part of the plan, the County redesignated Island Crossing as urban commercial and included it in Arlington's Urban Growth Area (UGA). The Growth Management Hearings Board affirmed the decision in *Sky Valley v. Snohomish County*, No. 95-3-0068c (Final Decision and Order[, 1996 WL 734917]).[1]

In 1997, the Snohomish County Superior Court reviewed the Board's decision affirming the County's action and determined substantial evidence in the record did not support the redesignation of Island Crossing and the inclusion of the land in the UGA. Specifically, the superior court found that Island

---

[1] *Sky Valley v. Snohomish County*, 1996 WL 734917, pt. 8 of 10, at *86-87 (Wash. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Mar. 12, 1996), *available at* http://www.gmhb.wa.gov/central/decisions/index.html (last visited Mar. 26, 2007).

Crossing is in active/productive use for agricultural crops on a commercial scale and that the area is not characterized by urban growth under GMA standards. The superior court remanded to the Board for a detailed examination. The Board in turn ordered the County to conduct additional public hearings on this issue.

The County held public hearings, and after considering the oral and written testimony and the Planning Commission's public hearings record, the Snohomish County Council passed two ordinances redesignating Island Crossing as agricultural resource land and removing it from Arlington's UGA. Specifically, the Council found that Island Crossing is devoted to agriculture and is actually used or is capable of being used as agricultural land. It also found that the area is in current farm use, with interspersed residential and farm buildings. The County Executive approved the ordinances.

Dwayne Lane, a party in the current case and owner of 15 acres of land bordering I-5 in Island Crossing, challenged the County's designation of Island Crossing as agricultural resource land. Lane planned to locate an automobile dealership on his land at Island Crossing. He filed a petition for review of the County's 1998 decision with the Board, contending that the County failed to comply with the GMA. The Board concluded that the County complied with the GMA and that the County's conclusion was not clearly erroneous. The superior court affirmed the Board's decision.

Lane then appealed to this court. Lane argued that the record did not support the Board's decision to affirm the County's designation of Island Crossing as agricultural resource land under the GMA. In an unpublished decision, this court disagreed with Lane, concluding:

Island Crossing is composed of prime agricultural soils and has been described as having agricultural value of primary significance. Except for the County's 1995 dedesignation of Island Crossing as agricultural land, Island Crossing has been designated and zoned agricultural since 1978. Thus, the record supports a finding that Island Crossing is capable of being used for agricultural production. Although Island Crossing borders the interchange of Interstate 5 and State Road 530, it is separated from Arlington by farmland.

Indeed, the record contains evidence to indicate that most of the land in Island Crossing is being actively farmed, except a small area devoted to freeway services. Thus, the record indicates that the land is actually used for agricultural production. The only urban development permits issued for Island Crossing are for the area that serves the freeway. Further, the substantial shoreline development permit for sewer service in the freeway area explicitly "prohibits any service tie-ins outside the Freeway Service area." Thus, adequate public facilities and services do not currently exist. Although Lane speculates that it may be possible for him to obtain permits under exceptions to the present restrictions, he fails to demonstrate that such permits can be provided in an efficient manner as required by statute.

Although the record may contain evidence to support a different conclusion, this court cannot reweigh the evidence. Indeed, the record contains substantial evidence supporting the conclusion that the designation of Island Crossing as agricultural land encourages the conservation of productive agricultural lands and discourages incompatible uses in accordance with the GMA. And the removal of Island Crossing from Arlington's UGA is consistent with the GMA's goal to encourage development in urban areas where adequate public facilities and services exist or can be provided in an efficient manner. The record supports the Board's decision that the County's designation of Island Crossing as agricultural resource land was not clearly erroneous. Further, as discussed above, Lane failed to show that the Board made a legal error or that its decision was arbitrary and capricious. Thus, he failed to satisfy his burden of showing that the Board's action was invalid and, as a result, Lane is not entitled to relief.[2]

*Current Appeal*

Two years later, in September 2003, the Snohomish County Council passed amended ordinance No. 03-063. The ordinance amended the County's Comprehensive Plan to add 110.5 acres in Island Crossing to the Arlington UGA, changed the desig-

---

[2] *Lane v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, noted at 105 Wn. App. 1016, 2001 Wash. App. LEXIS 425, at *16-18 (citations omitted).

nation of that land from Riverway Commercial Farmland (75.5 acres) and Rural Freeway Service (35 acres) to Urban Commercial, and rezoned the land from Rural Freeway Service and Agricultural (10 acres) to General Commercial.

An appeal was filed with the Board in October 2003. The Board divided the issues into three groups: the redesignation of agricultural resource land (issue 2), urban growth and expansion issues (issues 3 and 4), and critical areas issue (issue 5). The Board declined to address the critical areas issue, and that issue is no longer part of this appeal.

Regarding the redesignation of Island Crossing as urban commercial from agricultural resource land, the Board stated in its Corrected Final Decision and Order that the petitioners had carried their burden of proof to show the ordinance failed to be guided by, and did not substantively comply with, RCW 36.70A.020(8) (planning goal to preserve natural resource land) and that it failed to comply with RCW 36.70A.040 (local governments must adopt development regulations that preserve agricultural lands), RCW 36.70A.060(1) (conservation of agricultural lands), and RCW 36.70A.170(1)(a) (designation of agricultural lands). The Board found that the County's action was unsupported by the record and thus was clearly erroneous in concluding that the land in Island Crossing no longer met the criteria for designation as agricultural land of long-term commercial significance, and remanded the ordinance to the County to take legislative action to bring it into compliance with the goals and requirements of the GMA.

Regarding the UGA and expansion issues, the Board stated in its decision and order that petitioners had carried their burden of proof to show the ordinance failed to be guided by and did not substantively comply with RCW 36.70A.020(1),(2), and (8) (planning goals requiring encouragement of urban growth in urban growth areas, reduction of sprawl, enhancement of natural resource industries) and that it failed to comply with RCW 36.70A.110 and .215 (limiting UGA expansions to land necessary to accommodate projected future growth and setting priorities for the expansion of urban growth areas) and RCW 36.70A.210(1). The Board therefore concluded that the County's action regarding the UGA expansion was clearly erroneous and remanded the ordinance to the County to take legislative action to bring it into compliance with the goals and require-

ments of the GMA. Upon remand, the County held new hearings, took new testimony, and adopted a new land capacity analysis. Based on the new evidence, the County adopted Emergency Ordinance No. 04-057.

A compliance hearing was held by the Board in June 2004, and the Board entered an Order Finding Continuing Noncompliance and Invalidity and Recommendation for Gubernatorial Sanctions. The Board found that the County had achieved compliance with RCW 36.70A.215 but had failed to carry its burden of proving compliance with the other GMA provisions.

Snohomish County, the City of Arlington, and Dwayne Lane jointly appealed the Board's Amended Final Decision and Order and the Order on Compliance to the superior court. Futurewise and the Stillaguamish Flood Control District filed a motion to dismiss, claiming that the issue of whether the county ordinances complied with the GMA was barred by res judicata and collateral estoppel. The superior court granted the motion to dismiss and also affirmed the Board's decisions on the merits.

The City of Arlington, Snohomish County, and Dwayne Lane appeal.

## ANALYSIS

*Standard of Review*

The appropriate standard of review, as summarized in the recent Supreme Court opinion *Lewis County v. Western Washington Growth Management Hearings Board,*[3] is as follows:

> The Board is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance" unless it determines that a county action "is clearly erroneous in view of the entire record before the board and in light of the goals and requirements" of the GMA. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must have a "firm and definite conviction that a mistake has been committed." *Dep[']t of Ecology v. Pub. Util.*

---

[3] *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 139 P.3d 1096 (2006).

*Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993). On appeal, we review the Board's decision, not the superior court decision affirming it. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (hereinafter referred to as *Soccer Fields*). " 'We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court.' " *Id.* (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 45, 959 P.2d 1091 (1998). . .).

The legislature intends for the Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A-.3201. But while the Board must defer to Lewis County's choices that are consistent with the GMA, the Board itself is entitled to deference in determining what the GMA requires. This court gives "substantial weight" to the Board's interpretation of the GMA. *Soccer Fields*, 142 Wn.2d at 553.[4]

Furthermore, "[u]nder the Administrative Procedure Act . . . , chapter 34.05 RCW, a court shall grant relief from an agency's adjudicative order if it fails to meet any of nine standards delineated in RCW 34.05.570(3)."[5] Here, the appellants assert the Board engaged in unlawful procedure or decision-making process or failed to follow a prescribed procedure (RCW 34.05.570(3)(c)), the Board erroneously interpreted the law (RCW 34.05.570(3)(d)), the Board's order is not supported by evidence that is substantial when viewed in light of the whole record before the court (RCW 34.05.570(3)(e)), and the Board's order was arbitrary and capricious (RCW 34.05.570(3)(i)).

Errors of law alleged under subsections (c) and (d) are reviewed de novo.[6] Errors alleged under subsection (e) are mixed questions of law and fact, where the reviewing court determines the law independently, then applies it to the facts

---

[4] *Lewis County*, 157 Wn.2d at 497-98.

[5] *Lewis County*, 157 Wn.2d at 498.

[6] *Magula v. Dep't of Labor & Indus.*, 116 Wn. App. 966, 969, 69 P.3d 354 (2003) (citing *City of Redmond*, 136 Wn.2d at 45).

as found by the Board.[7] Substantial evidence is " 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' "[8]

For the purposes of subsection (i), arbitrary and capricious actions include " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.' "[9] Furthermore, " '[w]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.' "[10]

*Redesignation of Island Crossing from Agricultural Resource Land to Urban Commercial*

Under the GMA, counties must designate "[a]gricultural lands that are not already characterized by urban growth and that have long term significance for the commercial production of food or other agricultural products."[11] Furthermore, counties must adopt development regulations "to assure the conservation of" those agricultural lands designated under RCW 36.70A.170.[12]

While this case was awaiting oral argument, the definition of "agricultural land" for GMA purposes was addressed by the Supreme Court in *Lewis County*. The court held that three factors must be met before land may be designated agricultural land for the purposes of the GMA. The court stated:

> [A]gricultural land is land: (a) not already characterized by urban growth (b) that is primarily devoted to the commercial production of agricultural products enumerated in RCW 36.70A.030(2), including land in areas used or capable of being used for production based on land characteristics, *and* (c) that has long-term commercial significance for agricul-

---

[7] *Lewis County*, 157 Wn.2d at 498.

[8] *City of Redmond*, 136 Wn.2d at 46 (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

[9] *City of Redmond*, 136 Wn.2d at 46-47 (quoting *Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991)).

[10] *City of Redmond*, 136 Wn.2d at 47 (quoting *Kendall*, 118 Wn.2d at 14).

[11] RCW 36.70A.170(1)(a); *see also Lewis County*, 157 Wn.2d at 498-99.

[12] RCW 36.70A.060(1)(a); *see also Lewis County*, 157 Wn.2d at 499.

tural production, as indicated by soil, growing capacity, productivity, and whether it is near population areas or vulnerable to more intense uses. We further hold that counties may consider the development-related factors enumerated in WAC 365-190-050(1) in determining which lands have long-term commercial significance.[13]

The WAC factors include:

(a) The availability of public facilities;

(b) Tax status;

(c) The availability of public services;

(d) Relationship or proximity to urban growth areas;

(e) Predominant parcel size;

(f) Land use settlement patterns and their compatibility with agricultural practices;

(g) Intensity of nearby land uses;

(h) History of land development permits issued nearby;

(i) Land values under alternative uses; and

(j) Proximity of markets.[14]

In the ordinances at issue in this case, Snohomish County made the following finding regarding whether the land in question was agricultural land for GMA purposes:

The land contained within the Island Crossing Interchange Docket Proposal is not agricultural land of long term commercial significance. Although some of the soils may be of a type appropriate for agricultural use, soil type is only one factor among many others in the legal test for agricultural land of long term commercial significance. The County Council has addressed the question as to whether the land is

"primarily devoted to the commercial production of agricultural products and has long term commercial significance for agricultural production"

and found that it is not.

---

[13] *Lewis County*, 157 Wn.2d at 502.

[14] WAC 365-190-050(1).

At the public hearing, the testimony of Mrs. Roberta Winter ([Ex.] 111) was very persuasive on this point. Since the mid-1950's, she and her husband had a dairy farm in the very location of the Island Crossing Interchange Docket Proposal site. Locating and then expanding I-5 put them out of the dairy business. They soon discovered that crops generated less revenue than the property taxes. The Winters sold the land because the land could not be profitably farmed.

Council finds that this land cannot be profitably farmed, and is not agricultural land of long term commercial significance.

The Board found that the County's action in redesignating the land was clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the GMA. We find the Board erred in concluding the County committed clear error in determining the land in question has no long-term commercial significance for agricultural production. There is evidence in the record supporting the County's determination on this point, and the Board wrongly dismissed this evidence. Because this evidence supports the County's finding that the land at Island Crossing has no long-term commercial significance for agricultural production, the Board erred in not deferring to the County's decision to redesignate the land for urban commercial use.

As stated in the *Lewis County* decision, agricultural land for the purposes of the GMA is, among other things, land that "has long-term commercial significance for agricultural production, as indicated by soil, growing capacity, productivity, and whether it is near population areas or vulnerable to more intense uses."[15] Furthermore, "counties may consider the development-related factors enumerated in WAC 365-190-050(1) in determining which lands have long-term commercial significance."[16]

In regards to whether the land at Island Crossing has long-term commercial significance for agricultural production, the Board stated:

---

[15] *Lewis County*, 157 Wn.2d at 502.

[16] *Lewis County*, 157 Wn.2d at 502.

*2. Do the 75.5 acres of land at Island Crossing have long-term commercial significance?*

Again, the Board answers in the affirmative. The County relies on Finding T, set forth in Finding of Fact 3, . . . to support its conclusion that the Riverway Commercial Farmland no longer has long-term commercial significance. The "evidence" relied upon is testimony from an individual who operated a dairy farm in the vicinity fifty years ago who opined that she sold her farm "because the land could not be profitably farmed." Ex. 111. Anecdotal testimony, particularly from an individual whose direct experience with the area is decades removed from the present and whose declared expertise was in dairy rather than crop farming, does not constitute credible evidence on which to support the County's action. Also, as Petitioners noted, this "Finding" was contradicted by others with present-day experience in crop farming in the Stillaguamish Valley.

The Board went on to cite the report of the Snohomish County Planning and Development Services (PDS), the Draft Supplemental Environmental Impact Statement (DSEIS), the United States Department of Agriculture (USDA) soils report, and the recommendations of the Snohomish County Agricultural Advisory Board as substantial evidence contrasting sharply with the testimony relied upon by the County.

For example, both the PDS report and DSEIS specifically address the relevant WAC factors and conclude that the land in question is agricultural land of long-term commercial significance:

Analyses of the proposal conducted by PDS conclude that under the GMA's minimum guidelines for classification of agricultural lands, the portion of the proposal site currently designated and zoned for agricultural uses should continue to be classified as such. This conclusion is based on the following analysis of the GMA guidelines:

- *Availability of Public Facilities:* Public water and sanitary sewer facilities are physically located in and adjacent to the proposal site. However, sanitary

sewer service is restricted by the [General Policy Plan (GPP)] to Urban Growth Areas. The shoreline substantial development permit for the existing sewer line restricts availability of sanitary sewer to the existing parcels zoned Rural Freeway Service.

- *Tax Status:* Several large parcels in the area (approximately 32% of the area) are classified as Farm and Agricultural Land by the Snohomish County Assessor and are valued at their current use rather than "highest and best use." The other parcels in the area, however, are valued and taxed at their "highest and best use".

- *Availability of Public Services:* Public Services such as public water and sanitary sewer service are physically located within and adjacent to the proposal site. However, sanitary sewer service is restricted by the GPP to Urban Growth Areas. The existing sanitary sewer line is available by conditions in the shoreline substantial development permit to existing parcels zoned Rural Freeway Service.

- *Relationship or proximity to urban growth areas:* The proposal site is approximately 0.9 miles from the Arlington city limits and is functionally separated from the City because it is within the Stillaguamish River floodplain. The southern tip of the proposal site, however, is adjacent to the Arlington UGA.

- *Land Use Settlement Patterns and Compatibility with Agricultural Practices:* Most of the proposal site is currently in farm use with interspersed residential and farm buildings.

- *Predominant Parcel Size:* Predominant parcel sizes are large and of a size typically found in areas designated commercial farmland. Nine parcels are located within the 75.5 acres of the proposal site designated Riverway Commercial Farmland. Approximate sizes of these parcels are 20.7 acres, 15.8 acres, 14.6 acres, 8.1 acres, 2.9 acres, and three smaller parcels.

- *Intensity of Nearby Uses:* More intense land uses and urban land developments are located within the Rural Freeway Commercial node at the I-5/SR 530 interchange that has existed essentially in its present configuration since 1968. Farmland is located immediately to the east, and, separated by I-5, to the west.

- *History of Land Development Permits Issues Nearby:* No urban development permits have been issued in the vicinity of the proposal site except for the substantial shoreline development permit issued for the sewer line that serves only the existing rural freeway commercial uses.

- *Land Values under Alternative Uses:* The area of the proposal site outside of the Rural Freeway Service designation is in the floodway fringe area of the Stillaguamish River. Higher uses than farming would be difficult to locate in the area because of the floodplain constraints.

- *Proximity of Markets:* Markets within Arlington, Marysville, and Stanwood are located in close proximity to the site.

In addition, soils in the proposal area are prime farmland soils as defined by the [USDA Soil Conservation Service] and Snohomish County. . . .

Based on review of the site characteristics and the GMA criteria, the proposal area meets the criteria for an agricultural area of long-term commercial significance. The proposal area contains prime farmland soils, is not characterized by urban growth, and is adjoined by uses that are compatible with agricultural practices.

Respondents argue that the DSEIS is unique because it is "the only comprehensive, GMA-focused analysis" in the record.

However, Dwayne Lane, a litigant in this case, hired consulting firm Higa-Burkholder to conduct a similar analysis employing the WAC criteria, and Higa-Burkholder came to the opposite conclusion. Higa-Burkholder analyzed the WAC factors as follows:

(a) *Availability of public facilities:* The interchange is currently serviced by water and sewer, power, telecommunications, and gas. The fact that sewer expansion is limited by the existing Shoreline permit (1977) only means that to expand sewer service, a proposal must be approved by the Snohomish County Council under a Shoreline Permit application. In fact, the facilities exist and, in the case of water are in use.

(b) *Tax Status:* All but one parcel is smaller than 20 Acres Minimum for Open Space Taxation. Many property owners are being assessed tax rates that, according to the Snohomish County Assessor's Office, reflect "freeway influence" implying that the County believes that these properties have a "higher and better use" than agriculture. Taxes on this land are higher than the revenues generated from farming. Tax assessments reflect the availability of water.

(c) *Availability of Public Services:* Island Crossing has automobile services, lodging, food, and transit access.

(d) *Relationship and Proximity to UGA:* The Arlington UGA border is the southern boundary of the subject area. The City will annex the area through a special election in November of 2003.

(e) *Predominant Parcel Size:* The 1982 Snohomish County Agricultural Provision Plan . . . suggests the optimum size for agricultural parcels is 40 acres with 20 acres minimum for crop production if adjacent to other large parcels. Minimum size for specialty crops is ten acres. A majority of the parcels are smaller than the 20 acres considered minimum for large-scale farming and for qualification for the open space tax abatement program for agriculture.

(f) *Land Use and Settlement Patterns and Their Compatibility with Agricultural Practices:* Well-documented conflicts exist with traffic and urban development. Traffic counts have increased to the point where it is dangerous for farm vehicles to cross the highway and certainly to pasture animals that often escape endangering the traveling public. These things limit the viability of agricultural [sic].

(g) *Intensity of Nearby Land Uses:* This interchange represents one of two connections to I-5 for a large market area including Darrington, Arlington, Smokey Point and North Marysville. These communities have been some of the fastest growing areas in Snohomish County. Arlington has approved the development of an Airport Industrial Park that has the potential to add 4000 jobs to the community, half of which will use the Island Crossing Interchange over the next ten years.

The Stillaguamish Tribe has developed a tribal center that includes several high traffic generating businesses including a smoke shop, a pharmacy, fireworks store, a police station and a community center. This development is located at the intersection of SR 530 and Old Highway 99. Currently, the Tribe's property is served by City of Arlington Water, but it has no public sewer service. The Tribe has plans to expand their operation at Island Crossing by purchasing other land and converting it to Trust Land.

(h) *History of Development Permits Nearby:* Over 200 homes have recently been developed on 47th Street NE less than one half mile from Island Crossing. Smokey Point Boulevard has been the center of residential growth over the past ten years. Island Crossing represents one of two access points to I-5 for all of this growth.

(i) *Land Values under Alternative Uses:* Island Crossing has the potential to benefit Snohomish County economically. Jobs, sales tax revenue and property taxes are but a few of the economic benefits.

(j) *Proximity to Markets:* Although this area is in the Puget Sound population center and access to markets for farm products is close by, most production is occurring elsewhere, for example, in Eastern Washington where fewer conflicts with urban land uses, access to large parcels and lower priced land make agriculture viable. Twin City Foods imports its raw product from the east side of the State and no longer grows product in this area.

Relying on our Supreme Court's decision in *City of Redmond*, the Board dismissed the entire Higa-Burkholder analysis out of hand. Specifically, the Board construed the Higa-Burkholder report to be "reflections, if not direct expressions, of 'landowner intent' " and assigned it "the appropriate weight."

The Board incorrectly relied on *City of Redmond* to dismiss this evidence. In *City of Redmond* the Supreme Court analyzed the meaning of the phrase "devoted to" as used in the GMA definition of agricultural land and held:

> While the land use on the particular parcel and the owner's intended use for the land may be considered along with other factors in the determination of whether a parcel is in an area primarily devoted to commercial agricultural production, neither current use nor landowner intent of a particular parcel is conclusive for purposes of this element of the statutory definition.[17]

All *City of Redmond* holds is that a landowner cannot control whether land is primarily devoted to agriculture by taking his or her land out of agricultural production. It does not say the Board may dismiss evidence supporting the County's decision if it was obtained at the request of an interested party. The Board erroneously used *City of Redmond* as a tool with which to dismiss an important piece of evidence that supported the County's position with regards to whether Island Crossing was agricultural land of long-term commercial significance. To the extent this evidence supports the County's conclusion that the land was not of long-term commercial significance to agricultural production, and we find that it does, the Board would be required under the GMA to defer to the County and affirm its decision redesignating the land urban commercial.

*Expansion of the Arlington UGA*

The Board also found the expansion of the Arlington UGA in Amended Ordinance No. 03-063 did not comply with the

---

[17] *City of Redmond*, 136 Wn.2d at 53.

GMA for two reasons. First, the Board found the record did not contain a valid land capacity analysis demonstrating a need for additional commercial land. In response, the County submitted a Large Plot Parcel Analysis prepared by Higa-Burkholder[18] as part of its statement of compliance, and the Board found this action cured noncompliance with RCW 36.70A.215. This issue is therefore not part of this appeal.

Second, the Board found the Expanded UGA including Island Crossing did not meet the locational requirements of RCW 36.70A.110(1), which states in pertinent part:

An urban growth area may include territory that is located outside of a city *only if such territory already is characterized by urban growth* whether or not the urban growth area includes a city, *or is adjacent to territory already characterized by urban growth,* or is designated new fully contained community as defined by RCW 36.70A.350.[19]

The Board concluded in its Corrected Final Decision and Order:

As to whether the expanded UGA for Island Crossing meets the *locational* requirements of RCW 36.70A.110, the Board agrees with Petitioners. The closest point of contact between Arlington's city limits and private property within the expansion area is approximately 700 feet. . . . Also, the fact that limited sewer service is adjacent to, or even existing within, a rural area is not dispositive on the question of whether the area is urban in character. Therefore, the Board concludes the subject property is not "adjacent to land characterized by urban growth," and does not comply with RCW 36.70A.110(1).

The Board explained further in its Order Finding Continuing Noncompliance:

No new facts or reasoning are presented to disturb the Board's conclusions that Island Crossing continues to have agricultural lands of long-term commercial significance, that the presence of a sewer line is irrelevant, particularly

---

[18] This is a different report than the one that evaluated whether the land at Island Crossing was agricultural land of long-term commercial significance.

[19] (Emphasis added.)

given its limitations, that the freeway service uses do not rise to the status of "urban growth," and that Island Crossing is not "adjacent" to the Arlington UGA or a residential "population" of any sort. In fact, the private lands within this proposed UGA expansion would be connected to the Arlington UGA only by means of a 700 foot long 'cherry stem' consisting of nothing but public right-of-way. . . . While such dramatically irregular boundaries were common in the pre-GMA era, the meaning of "adjacency" under the GMA precludes such behavior.

"Urban growth" is defined in the GMA as:

growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands designated pursuant to RCW 36.70A.170. A pattern of more intensive rural development, as provided in RCW 36.70A.070(5)(d), is not urban growth. When allowed to spread over wide areas, urban growth typically requires urban governmental services. *Characterized by urban growth" refers to land having urban growth located on it, or to land located in relationship to an area with urban growth on it as to be appropriate for urban growth.*[20]

We find that the unique location of the land at Island Crossing as abutting the intersection of two freeways and its connection to the Arlington UGA together meet the requirements of RCW 36.70A.110(1). Thus, the County's reliance on such facts in expanding the Arlington UGA was proper and the Board's decision reversing the County's action is erroneous.

The County stated in its ordinance: "This land is located at an I-5 interchange between an interstate highway and a state highway, and is uniquely located for commercial needs of the area. . . . This land has unique access to utilities." In other words, the County concluded that the land is appropriate for urban growth because the land is located at a highway interchange and has unique access to utilities. The County also

---

[20] RCW 36.70A.030(18) (emphasis added).

acknowledged the land has existing freeway service structures on it and is adjacent to the City of Arlington's UGA. Taken together, these facts at least support a conclusion that the land in question is "located in relationship to an area with urban growth on it as to be appropriate for urban growth" and thus characterized by urban growth.[21]

Furthermore, the Board's conclusion that Island Crossing is not adjacent to the Arlington UGA for GMA purposes is also erroneous. It is undisputed that the area in question borders Arlington's UGA. The question posed here is whether the 700 foot border consisting entirely of freeway and access road rights-of-way constitute the adjacency to "territory already . . . characterized by urban growth" required by RCW 36.70A-.110(1). In reaching its decision, the Board emphasized the geography and topography of the land in question and decided that, in this case, such concerns should control whether the land involved was adjacent to land characterized by urban growth and not simply the 700 foot UGA boundary to the south.

The Board offers no support for its definition of "adjacent," which to the Board implies something more than the simple dictionary definition of "abutting" or "touching." We decline to adopt the Board's definition of adjacent in favor of the plain meaning of the term. Because the land in question touches the Arlington UGA, it is adjacent to territory already characterized by urban growth for the purposes of RCW 36.70A.110(1).

*Res Judicata and Collateral Estoppel*

The parties argue much over whether the issues of res judicata and collateral estoppel were timely raised below; however, an analysis of the issues on the merits reveals the superior court erred in granting the motion to dismiss the appeal based on res judicata and collateral estoppel.

"Resurrecting the same claim in a subsequent action is barred by res judicata."[22] Under the doctrine of res judicata, or claim preclusion, "a prior judgment will bar litigation of a subsequent claim if the prior judgment has 'a concurrence of identity with [the] subsequent action in (1) subject matter,

---

[21] RCW 36.70A.030(18).

[22] *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 31, 891 P.2d 29 (1995).

(2) cause of action, (3) persons and parties, and (4) the quality of the persons for or against whom the claim is made.' "[23]

"When a subsequent action is on a different claim, yet depends on issues which were determined in a prior action, the relitigation of those issues is barred by collateral estoppel."[24] Collateral estoppel, or issue preclusion, requires

"(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied."[25]

"In addition, the issue to be precluded must have been actually litigated and necessarily determined in the prior action."[26]

Here, the superior court dismissed the appeal on grounds that the appellants' claims were barred by res judicata and collateral estoppel. The superior court stated in its Decision on Appeal Affirming Growth Board:

4.2 In prior proceedings involving many of the same parties, in 1998 the Board affirmed Snohomish County's designation of the subject property (Island Crossing property) as agricultural resource land (75.5 acres) and Rural Freeway Service (35 acres) and removed it from the Arlington urban growth area (UGA). That decision was eventually affirmed by the Court of Appeals in an unreported decision (*Dwayne Lane v. Central Puget Sound Growth Management Hearings Board*, No. 46773-5-I[, noted at 105 Wn. App. 1016]). In order to re-designate the land, the County must show that there has been a change in circumstances since 1998, and that the property is no longer properly designated as agricultural resource land and Rural Freeway service.

4.3 The Petitioners have failed to demonstrate any material change in circumstances justifying a change in the designation of the land.

---

[23] *In re Election Contest Filed by Coday*, 156 Wn.2d 485, 500-01, 130 P.3d 809 (2006) (alteration in original) (quoting *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995)).

[24] *Hilltop Terrace Homeowner's Ass'n*, 126 Wn.2d at 31.

[25] *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987) (quoting *Malland v. Dep't of Ret. Sys.*, 103 Wn.2d 484, 489, 694 P.2d 16 (1985)).

[26] *Shoemaker*, 109 Wn.2d at 508.

The superior court explained further in its oral decision:

> As I've already stated, these issues have twice before been the subject of proceedings before the Board and the Court. *On both occasions the Court has held that the lands should be properly designated as agricultural, and that the area should not be included in the Urban Growth Area.* The causes of action are identical, the persons and parties are the same, although on the second appeal in 2001, the County was on the other side. I don't think this detracts from the applicability of the other principles and the quality of the parties are the same.[27]

The superior court in its decision and the respondents in their briefs misstate the issues and claims that were before the Board and the courts. The inquiry before the Board and the courts in the prior litigation was not whether the land was properly designated agricultural resource land as opposed to urban commercial land. The inquiry was whether the County *committed clear error* in designating the land agricultural in view of the entire record before the Board and in light of the goals and requirements of the GMA. This distinction is crucial.

In the prior Island Crossing litigation, we ultimately held "the Board's decision that the County's designation of Island Crossing as agricultural resource land was not clearly erroneous."[28] This court did not hold that the land was agricultural resource land of long-term commercial significance. We could not have done so even had we tried. This is because the Board's review is limited to whether "the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA],"[29] and our review was limited to whether the Board's decision was supported by substantial evidence or was arbitrary and capricious.

Because clear error is such a high standard to meet, it follows that situations may exist where a county could properly designate land either agricultural or urban commercial de-

---

[27] (Emphasis added.)

[28] *Lane*, 2001 Wash. App. LEXIS 425, at *18.

[29] RCW 36.70A.320(3).

pending on how the county exercises its discretion in planning for growth, without committing clear error. The legislature recognized this when it implemented the clear error standard of review:

> In recognition of the *broad range of discretion* that may be exercised by counties and cities consistent with the requirements of this chapter, the legislature intends for the boards to grant great deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter.[30]

A county's decision to designate land agricultural or urban commercial, or to expand its urban growth area, is thus an exercise of its discretion that will not be overturned unless found to be clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the GMA.

In the present case, the issues include whether the County's exercise of its discretion in redesignating the same land as urban commercial and expanding the Arlington UGA to include Island Crossing was clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the GMA. This is not the same issue or claim that was before the Board and the courts in the prior litigation. As stated before, the issue in that litigation was whether the County's decision to designate the land agricultural was clearly erroneous. The superior court's decision to bar the appeal on res judicata and collateral estoppel grounds was in error. The appellants were entitled to a decision on appeal as to whether the County's subsequent decision to redesignate Island Crossing was clearly erroneous.

In short, simply because the Board and courts previously held that the agricultural designation was not clearly erroneous in view of the record and in light of the GMA does not mean that an urban commercial designation would be clearly erroneous in view of the same or similar record and in light of the goals and requirements of the GMA. The prior judgment and the current litigation do not involve the same claim, nor are the

---

[30] RCW 36.70A.3201 (emphasis added).

issues identical. Thus, the superior court should not have precluded the petitioners from challenging the Snohomish County ordinances at issue in this case.

The superior court's decision is erroneous in another respect. Specifically, the superior court's holding that "[i]n order to re-designate the land, the County must show that there has been a change in circumstances since 1998, and that the property is no longer properly designated as agricultural resource land and Rural Freeway service" impermissibly shifts the burden away from the petitioners. Under RCW 36.70A-.320(2), "the burden is on the petitioner to demonstrate that any action taken by a state agency, county, or city under [the GMA] is not in compliance with the requirements of [the GMA]." In the Court of Appeals decision in *City of Redmond v. Central Puget Sound Growth Management Hearings Board* (hereinafter referred to as *City of Redmond* II),[31] we held that the Board erroneously placed the burden on the city to demonstrate conclusive evidence of changed circumstances in order to justify the de-designation of agricultural resource land. The superior court's ruling that the County be required to show evidence of changed circumstances in order to overcome collateral estoppel and res judicata thus directly conflicts with the statutorily mandated burden of proof set forth in RCW 36.70A.320(2) and affirmed in *City of Redmond* II.

In sum, we hold the Board erred in finding the County committed clear error in concluding that the land at Island Crossing had no long term commercial significance to agricultural production. The Board erred because it dismissed a key piece of evidence that supported the County's conclusion on this point. Because there is evidence in the record to support the County's conclusions, the Board should have deferred to the County.[32]

Furthermore, we hold the Board erred in finding the County committed clear error in including the land at Island Crossing within the newly expanded Arlington UGA. There are facts in the record to support the conclusions that the land in question is characterized by urban growth and/or adjacent to territory already characterized by urban growth.

[31] *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 11[6] Wn. App. 48, 56, 65 P.3d 337 (2003) (emphasis added).

[32] *See* RCW 36.70A.3201.

Finally, we hold the superior court erred in dismissing the appeal on res judicata and collateral estoppel grounds. We thus reverse and remand this matter to the Board for a decision consistent with the opinion of this court.[33]

C. JOHNSON, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶2 CHAMBERS, J. (concurring) — I concur with the majority in result. I write separately to emphasize that our legislature has directed the growth management hearings boards to show deference to the local governments and has directed this court to show deference to the hearings boards. *Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hearings Bd.*, 161 Wn.2d 415, 424, 166 P.3d 1198 (2007) (citing RCW 36.70A.3201 and RCW 34.05.570(3)). The majority has passed by the fact that we review the hearing board's decision for substantial evidence. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000). Nothing in our opinion today should be read to change that.

¶3 With that reservation, I concur in result.

¶4 ALEXANDER, C.J. (dissenting) — The central issue before our court is whether Snohomish County correctly determined that the land in question, Island Crossing, is characterized by urban growth and/or is adjacent to a territory characterized by urban growth. The majority concluded, as did the Court of Appeals, that the record supports the county's determination. I disagree with this conclusion and, therefore, dissent.

¶5 On the issue of whether the 75.5 acres of Island Crossing is characterized by urban growth, it seems clear to me that the Central Puget Sound Growth Management Hearings Board correctly rejected the county's determina-

---

[33] RCW 34.05.574(1); *Manke Lumber Co. v. Diehl*, 91 Wn. App. 793, 809-10, 959 P.2d 1173 (1998).

tion that the land is characterized by such growth. One needs to look only at aerial photographs of this land to see that the great bulk of it is presently devoted to agricultural uses. Clerk's Papers (CP) at 322, 2133. The only activity on the land that approaches urban growth is that which is located on the small portion of the land near the freeway interchange, which contains freeway services. Looking at the land in its entirety, however, it cannot be said that there is "intensive use of [the] land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of [the] land for the production of food, [and] other agricultural products." RCW 36.70A.030(18).

¶6 Neither is the land "adjacent to territory already characterized by urban growth." RCW 36.70A.110(1). While the Central Puget Sound Growth Management Hearings Board must defer to county choices that are consistent with the Growth Management Act, chapter 36.70A RCW, the board is entitled to deference in determining what the act requires. *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 139 P.3d 1096 (2006). The Court of Appeals, in my judgment, failed to give appropriate weight to the board's determination of the term "adjacent" as it is used in RCW 36.70A.110(1). In making that determination, courts must " 'give careful consideration to the subject matter involved, the context in which the words are used, and the purpose of the statute.' " *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 239, 110 P.3d 1132 (2005) (quoting *City of Tacoma v. Taxpayers of the City of Tacoma*, 108 Wn.2d 679, 693, 743 P.2d 793 (1987)). Here, the board correctly concluded that although Island Crossing's "700 foot long 'cherry stem' consisting of nothing but public right-of-way" abutted the Arlington growth area, it was not sufficiently adjacent to that area for purposes of the act given the dramatically irregular boundaries and geography of the area. CP at 2908. This determination comports with the Growth Management Act's goal of concentrating growth in urban areas, reduc-

ing urban sprawl, and protecting the environment. RCW 36.70A.020(1), (2), (10).

¶7 The Department of Community, Trade and Economic Development and Futurewise each make the point that the Court of Appeals' interpretation of the term "adjacent" opens the door to a gerrymandered[1] approach to locating urban growth areas, since all that would be required to satisfy the "adjacent" criterion is that the proposed urban growth area touch an existing growth area. I agree with the department that the Court of Appeals' reliance simply on a dictionary definition of "adjacent," "without regard to statutory context or legislative intent," eliminates any meaningful locational limit on the expansion of an urban growth area. Pet. for Review at 19 (citing *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn. App. 1, 24, 154 P.3d 936 (2007)).[2]

MADSEN and STEPHENS, JJ., concur with ALEXANDER, C.J.

[No. 81030-3. En Banc.]
Argued February 14, 2008. Decided October 9, 2008.

---

[1] A term made famous by a salamander shaped election district in Massachusetts, which was formed for partisan purposes in 1812. This occurred during the governorship of Elbridge Gerry, a noted American statesman and signer of the Declaration of Independence.

[2] The department makes the dire prediction that the Court of Appeals' decision "would allow the Arlington UGA [urban growth area] to be extended north along I-5 beyond Island Crossing to the next freeway interchange, then to the one after that, so long as the end of the 'kite string' 'touches' the existing UGA." Pet. for Review at 19. Time will tell if this prediction is prescient or farfetched.